*Expert Declaration of Tim P. Fletcher*

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | : | |
| **HYDROW, INC.,** | : | |
| | : | C. A. No. 1:22-cv-00195-CFC |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| **iFIT HEALTH & FITNESS, INC.,** | : | |
| | : | |
| Defendant. | : | |
| | : | |

## DECLARATION OF TIM P. FLETCHER IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

### Introduction

1.      In the matter of *Hydrow, Inc. v. iFIT Health & Fitness, Inc.*, it is my understanding that Hydrow, Inc. ("Hydrow" or "Plaintiff") is asserting counts of infringement based on trade dress rights against the defendant's iFIT RW 900 & 700 (the "RW 900")[1] and a claim of infringement based on a design patent, which are described in further detail below.

2.      Hydrow has engaged me as an expert witness to offer an opinion in regard to the functionality and infringement of the Design Patents and Trade Dress alleged in Hydrow's complaint.  For purposes of this declaration, when I refer to the Hydrow Rower design patent ("Asserted Design Patent Rights"), I am referring

---

[1] For the purposes of this Declaration I assume the RW900 and RW700 are the same design for infringement purposes and which are virtually identical in their physical appearance.

*Expert Declaration of Tim P. Fletcher*

to the design patent rights and when I refer to the Hydrow Rower's trade dress, I am referring to the trade dress rights Hydrow is asserting as defined below ("Asserted Trade Dress Rights").

3.      It is my understanding that the Asserted Design Patent Rights are defined as:  US D898,843 ("the '843 Patent").

4.      It is my understanding that the Asserted Trade Dress Rights are embodied in the overall appearance of the Hydrow Rower with several feature elements:

**<u>Hydrow Rower</u>**



- the overall shape and contour of the main support structure that supports

- the moveable seat,

- stationary foot pads,

- which is tapered down at the ends,

- with a boomerang-like angular bend past midway after the foot pads,

2

*Expert Declaration of Tim P. Fletcher*

- where the angular bend section is wider than the ends in a downward horizontal direction,

- where the structure bend provides an upward narrowing tapered section from the main base,

- at the top of which is disposed an angular neck supporting a monitor facing the rower.

5.    Below is a picture of the accused devices, iFIT/NordickTrack's RW900 and RW700:



**RW900**

*Expert Declaration of Tim P. Fletcher*



**RW700**

## Qualifications

6.     I am an industrial designer and president of One BusinessDesign, LLC in Pittsburgh, Pennsylvania.  Industrial designers are graduates of schools of design either from a fine art orientation or a product development orientation.  I come from the product development orientation side of design.  Industrial Designers Society of America ("IDSA") defines industrial design as: "the professional service of creating and developing concepts and specifications that optimize the function, value and appearance of products and systems for the mutual benefit of both user and manufacturer."

7.     I earned my Bachelor of Environmental Design Degree in Product Design from North Carolina State University in 1989 and my Master of Design Degree in Advanced Strategies at the Hong Kong Polytechnic University in 2008. For more than 30 years I have worked as an industrial designer, product designer

*Expert Declaration of Tim P. Fletcher*

and developer, professor of industrial design courses, speaker, and consulting

industrial designer.  I am the named inventor on 17 design and utility patents in the

United States as well as three WIPO patents and one patent in Europe and one

patent in Australia.

8.      I have been employed as an industrial designer (designing new

products) and product development manager (developing products and improving

the process of product development and creation) for the following

consumer/commercial products companies: Stahlwood Manufacturing Co.; Gerber

Products Company; DP; Evenflo Company, Inc; Elumens; DAKA Designs; and

Performance Bike.  In total, I have designed or have overseen the design of over

150 products and product lines, including in respect of the design of toys, safety

products, cups, bottles, breast pumps, pacifiers, teethers, strollers and other

products for infants and toddlers, commercial electronics, exercise equipment and

storage solutions, and various other consumer products.  As an industrial design

consultant, I have design consumer/commercial products or new product strategies

for the following firms: Gamil Design, Daedalus, and One BusinessDesign.  As a

product development manager, I have sourced and inspected manufacturing plants

in the United States, China, and Thailand, and I have been involved in

troubleshooting manufacturing issues in the development of consumer/commercial

products.

*Expert Declaration of Tim P. Fletcher*

9.    My specific experience in the exercise equipment is as follows:

a. At DP (Diversified Products), I designed a high end treadmill group as shown below:

| 7096 Model | 7080 Model |
|:---:|:---:|
|  | |

b. At Performance Bike, I designed many rugged accessories for the bicycle market as shown below:

| Cargo Case | Off the Wall -Bicycle Storage |
|:---:|:---:|
|  | |

*Expert Declaration of Tim P. Fletcher*

| XClosure – Bike Rack Lock | Water Bottle Cage |
|---|---|



10.    My experience designing complex mechanical products as well as

mechanical/electrical products, at minimum, includes the following

| Augmented Reality Device | Museum Kiosk |
|---|---|



*Expert Declaration of Tim P. Fletcher*

| Curved Screen Projection System | Museum Immersive Environment |
|---|---|



11.    Beginning with my work at Evenflo in March 1996, I have worked with attorneys to prepare drawings for U.S. design patents. At Gamil Design and Elumens, I was involved in the preparation of drawings and text for multiple U.S. and World Intellectual Property Organization ("WIPO") utility patent applications. I also have developed design patent drawings for clients.

12.    I have taught industrial design courses at North Carolina State University, The Hong Kong Polytechnic University and Carnegie Mellon University. Courses include, but are not limited to, Manufacturing Materials and Processes, Professional Practice and Industrial Design Studio Courses, the latter of which included material relating to the form and preparation of design drawings.

13.    I was an invited speaker for the 2017 Design in Plastics conference put on by the Society of Plastics Engineers. My presentation was titled Visual

*Expert Declaration of Tim P. Fletcher*

Intellectual Property: The Value of Design Patents & Trade Dress.  In the presentation, I gave a brief history of design patents and trade dress, followed by a more in-depth analysis of patent application strategies as well as an explanation of design patent and trade dress registration and litigation.  In 2006, the Danish Patent and Trademark Office invited me to speak, and I provided a presentation titled IP as the Basis of Business for Innovative Companies in Asia.  In this presentation, I used case studies to explain alternative methods of protecting intellectual property from copying manufacturers in China.

14.    I was inducted into the IDSA Academy of Fellows in 2009.  The criteria for induction are: the Board of Directors may confer, by a two-thirds majority vote, a fellowship membership to a member in good standing who has earned the special respect and affection of the membership through distinguished service to the industrial design profession.

15.    Based on my education and experience as described above and as set out in my C.V. and list of publications, I believe I am qualified to render the opinions provided in this declaration.

16.    My opinions in this declaration are based on my judgment, training, education, experience, and expertise in designing and developing consumer/commercial products.

*Expert Declaration of Tim P. Fletcher*

17.     Industrial designers develop concepts and specifications for new consumer products.  In this role we are most focused on usability, but we must also understand, be conversant in, and implement feasibility, viability, and intellectual property (IP).

18.     In our main area of expertise, usability, we must understand the consumer, both mentally and physically. Mentally, we must consider the entire user experience and understand a user's needs and wants even if the consumer is unable to articulate them.  We do this through design research tools and methods. Physically, we must understand the ergonomics of the human body in order to create a product that functions comfortably when a consumer is using it.

19.     In regard to feasibility, we work together with engineers to make sure that current materials and manufacturing processes can be implemented to meet both quality and cost requirements.  In regard to viability, we work with marketers to create a product that distributors and retailers will find acceptable.

20.     In regard to IP, early in an industrial designer's career, we spend a lot of time reviewing and learning about prior art, typically design and utility patents, to assure that we are not duplicating others' rightfully protected property. Throughout our careers, we work with attorneys as necessary to prepare patent applications on products for which we are credited as inventors.  As we progress professionally and become senior industrial designers, managers and vice

*Expert Declaration of Tim P. Fletcher*

presidents of industrial design, we take a more strategic role regarding IP.  In my own experience, for example, my role has transitioned from an entry level industrial designer to working with companies to analyze their prototypes and identify specific elements that might be crafted into a patentable form.  An example would be where I analyzed specific parts of a product to assure that these parts were ornamental or design flourishes that could accordingly be protected by IP.  These non-functional parts protect against complete copying of the product.

21.    My rate of compensation for my expert services in this case is $250 per hour.  My compensation is not dependent on the outcome of this case.

22.    My current CV is attached hereto as Exhibit 2.

23.    The materials I considered in forming my opinions in this Declaration are referenced herein where relevant, and includes the Complaint in this case.

24.    In the last four years, I have testified in cases which are included as a list in CV (Exhibit 2).

**<u>Functionality</u>**

25.     I understand that a design is not patentable unless it is ornamental, and a design is not ornamental if it is "functional." Portions of a design also may be functional, and if so, they are "factored out" in an infringement analysis.

26.    I understand that [a]n article of manufacture necessarily serves a utilitarian purpose, and the design of a useful article is deemed to be functional

*Expert Declaration of Tim P. Fletcher*

when the appearance of the claimed design is 'dictated by' the use or purpose of the article.

27.    I understand that when assessing functionality, several factors that may indicate whether a design patent claim is functional is whether the protected design represents the best design; whether alternative designs would adversely affect the utility of the specified article; whether there are any concomitant utility patents; whether the advertising touts particular features of the design as having specific utility; and whether there are any elements in the design or an overall appearance clearly not dictated by function.

28.    I also understand that "[t]o qualify for protection, a design must present an aesthetically pleasing appearance that is not dictated by function alone." *Bonito Boats v. Thunder Craft Boats*, 489 U.S. 141, 148 (1989).

29.    I understand that trade dress can be protected under federal law if the party asserting trade dress rights establishes:  that the trade dress is distinctive or has acquired secondary meaning so as to identify the source of the product associated with the trade dress, that the asserted trade dress is not functional, and that there is a likelihood of confusion between the plaintiff's product and the allegedly infringing product.

30.    I understand that a product feature is functional, and cannot serve as a trademark or trade dress, if it is essential to the use or purpose of the article or

*Expert Declaration of Tim P. Fletcher*

good with which it is associated or if it affects the cost or quality of the article.  I

understand from counsel that a design is functional where, without its use,

competitors are at a significant non-reputation-related disadvantage.

31.    I understand from counsel that de facto functional features may be

entitled to trademark protection, while de jure functional features are not. For

example, the design of a product has a function (i.e., a bottle of any design holds

fluid) but can serve as trade dress, but if the product has a particular shape because

it works better in that shape, then the shape itself may not be protectable (i.e.,

something designed to look like a "bottle" because bottles are best at holding fluid

and dispensing fluid).

32.    I also understand that certain things may be considered when

determining whether a feature is functional, including the existence of a utility

patent disclosing the utilitarian advantages of the design, advertising materials in

which the originator of the design touts the design's utilitarian advantages, the

availability to competitors of functionally equivalent designs, and facts indicating

that the design results in a comparatively simple or cheap method of manufacturing

the product.  It is my understanding that useful mechanisms are functional while

ornamental, incidental, or arbitrary features or flourishes are not functional.

33.    It is my opinion that the Asserted Design Patent Rights and Asserted

Trade Dress Rights are not functional.  The claimed elements of the Asserted

*Expert Declaration of Tim P. Fletcher*

Design Patent Rights and Asserted Trade Dress Rights are each not dictated by function, and therefore not functional, and the overall appearance of the claimed elements of the Asserted Design Patent Rights and the combination of the claimed elements of the Asserted Trade Dress Rights are not functional.

34.    I have reviewed US Patent No. 10,828,531, which is a utility patent owned by Hydrow that depicts the 2-D shape of the side view of the Hydrow Rower, but I do not discern anything in the specification that suggests this shape is functional.

35.    I reserve the right to update or amend this declaration based on additional documents and information that may be provided to me.

36.    Hydrow is asserting Design Patent Rights in the Rower as shown below. The asserted patent US D898,843 S, the '843 Patent, is titled "Rowing machine." It was filed on July 16, 2018 and granted October 13, 2020. The Claim is for "The ornamental design for a for a rowing machine, as shown and described." The Description lists 8 figures and states that "The evenly spaced dash-dash broken lines in the drawings illustrate portions of the rowing machine that form no part of the claimed design".

*Expert Declaration of Tim P. Fletcher*



*Expert Declaration of Tim P. Fletcher*



**US Patent D898,843**

FIG. 3

FIG. 4

*Expert Declaration of Tim P. Fletcher*



*Expert Declaration of Tim P. Fletcher*



37.    The US patent laws permit a design patent for a design extending only

to a component of a multicomponent product, as confirmed by the US Supreme

Court.  *Samsung Electronics Co., Ltd. v. Apple Inc.*, 137 S. Ct. 429, 435 (2016)

*Expert Declaration of Tim P. Fletcher*

38.    According to 37 Code of Federal Regulations section 1.152 ("Design Drawings"):

> The design must be represented by a drawing that complies with the requirements of § 1.84 and must contain a sufficient number of views to constitute a complete disclosure of the appearance of the design. Appropriate and adequate surface shading should be used to show the character or contour of the surfaces represented. Solid black surface shading is not permitted except when used to represent the color black as well as color contrast. Broken lines may be used to show visible environmental structure, but may not be used to show hidden planes and surfaces that cannot be seen through opaque materials. Alternate positions of a design component, illustrated by full and broken lines in the same view are not permitted in a design drawing. Photographs and ink drawings are not permitted to be combined as formal drawings in one application. Photographs submitted in lieu of ink drawings in design patent applications must not disclose environmental structure but must be limited to the design claimed for the article.

39.    Special attention should be paid to broken lines in design patent drawings. The USPTO Design Application Guide states:

> A broken line disclosure is understood to be for illustrative purposes only and forms no part of the claimed design. Structure that is not part of the claimed design, but is considered necessary to show the environment in which the design is used, may be represented in the drawing by broken lines. This includes any portion of an article in which the design is embodied or applied to that is not considered part of the claimed design. When the claim is directed to just surface ornamentation for an article, the article in which it is embodied must be shown in broken lines. In general, when broken lines are used, they should not intrude upon or cross the showing of the claimed design and should not be of heavier weight than the lines used in depicting the claimed design. Where a broken line showing of environmental structure must necessarily cross or intrude upon the representation of the claimed design and obscures a clear understanding of the design, such an illustration should be included as a separate figure in addition to the other figures which fully disclose the subject matter of the design.

*Expert Declaration of Tim P. Fletcher*

See *https://www.uspto.gov/patents/basics/types-patent-applications/design-patent-application-guide#broken*

40.    I have reviewed the designated aspects of the Asserted Design Patent Rights and Asserted Trade Dress Rights as part of my evaluation of the Hydrow Rower.

41.    While the design of the Hydrow Rower necessarily has functional components, the actual design or overall ornamental appearance of the base structure is not necessarily functional.

42.    Based on my review of the Complaint in this action, which is further confirmed by the Declaration of Hydrow's CEO, I understand that prior to Hydrow, and my general knowledge of exercise rowers, and review of the prior art, prior existing rowing machines on the market did not have the aesthetic design of the main base structure of the Hydrow Rower.  The prior art referenced in this Declaration is collected and attached hereto as Exhibit 1.

43.    I understand in commissioning the design for the Hydrow Rower, Mr. Smith was inspired by three visual concepts: a wave, a 1971 Maserati Ghibli, and the bow of a Stämpfli single scull rower.

44.    I understand a third party design company was retained to reduce Mr. Smith's design inspiration ideas to an actual product design, with feedback from Hydrow, resulting in the design that became the '843 Patent.

*Expert Declaration of Tim P. Fletcher*

45.    Based on this information, and my review of the Hydrow Rower images, from the Hydrow web site,  and YouTube videos, in my opinion the shape of the main base structure of the Hydrow Rower is not functional to the rowing experience, and it could be changed arbitrarily in order to create a new aesthetic look without affecting function.

46.    One useful example of this variability of design choices is comparing the '843 Patent to the prior art rower designs:

| | |
|---|---|
| **US20110028278A1** A true and correct copy of this patent can be found in Exhibit 7. |  |
| **US9901768B1** A true and correct copy of this patent can be found in Exhibit 6. |  |

*Expert Declaration of Tim P. Fletcher*



| US20180056117A1<br>A true and correct copy of this patent can be found in Exhibit 9. | |
| US20180272182A1<br>A true and correct copy of this patent can be found in Exhibit 10. | |
| USD861805S1<br>A true and correct copy of this patent can be found in Exhibit 4. | |

47.    A further illustration of additional available base structure designs is iFIT/NordicTrack's existing offerings (https://www.nordictrack.com/rowing-machines), which shows that iFIT itself presently offers a different design of its base structure:

*Expert Declaration of Tim P. Fletcher*



48. As the '843 Patent is considered valid and the USPTO reviewed it for functionality it is my opinion that the design of the Hydrow Rower is ornamental and not dictated by function.

49. The current offerings of other companies also confirms that the Hydrow design is not the only design available for competition purpose. For example, on the website www.bestreviews.com, they depict several rower designs from different sources as of March 2022, including an alternative design from iFIT:

*Expert Declaration of Tim P. Fletcher*



50.     In addition, www.amazon.com shows that there are currently many offerings of varying design, see Exhibit 3 hereto.

51.     As can be seen in the above examples, the function of a rowing machine can occur without the ornamental appearance of the rowing machine having to be the same as in the Hydrow Rower.

52.     Therefore, the rowing machine is purely ornamental and not de jure functional.  Any functional aspect is mitigated by the arbitrary definition of the rowing machine in the context of Hydrow's Asserted Trade Dress Rights.

## Scientific Principles Used For Design Patent and Trade Dress Analyses

53.     In reaching the opinions expressed in this declaration, I employed several well-established principles from the field of design. These design principles were utilized to facilitate an understanding of how particular product designs are

*Expert Declaration of Tim P. Fletcher*

perceived by consumers and to apply a structured and scientific approach to analyzing the similarities and differences between product designs as seen by consumers.

54.     Vision science is a well-established interdisciplinary field dating back decades. Vision science focuses on understanding the nature of human visual perception, and more specifically, on how humans process visual information about the design of objects that they encounter in everyday life. There are several well-established areas of research within the overall field of vision science covering the basic psychology aspects of vision, spatial vision, color perception, scene perception, visual dynamic, visual memory, and visual awareness.


**<u>Gestalt Theory</u>**

55.     Many of the opinions expressed in this declaration are based on a working understanding of "Gestalt" principles are they apply to design. Gestalt is a German word for form or shape. It is used in design to refer to a concept of "wholeness." These principles of design were originally formulated and taught at the Staatliche Bauhaus and based on Gestalt psychology.

56.     During the past 50 years, Gestalt principles were questioned, dissected, and ultimately strengthened by the emergence of cognitive science and the researchers and theorists that established them. Gestalt theory of perception has

*Expert Declaration of Tim P. Fletcher*

influenced an extensive number of visual processing research fields, including machine learning, cybernetics, neurology, and information theory. Today, Gestalt theory is considered critical to explaining the role of cognitive science in consumer perception of product designs. They have served as the foundation of nearly every formal school of design education in the world and are frequently used by practicing industrial, graphic, and interior designers.

57.    Gestalt principles show that people perceive whole objects or figures rather than isolated bits and pieces of sensory information. For example, trees being of similar color, one sees the forest before the individual trees. This being the case, consumers will not disregard a product's overall form for certain details or features. In professional design practice, we often think of how we interact with the products we design on at least two different levels: attract and engage. At the "attract" level, we think of the overall gesture of the product, or "the 10-foot read." This is when we consider the form and silhouette of the product. At the "engage" level, we consider the details, including how they reflect or contrast with the gesture. On both levels, our observations are guided by Gestalt principles.

58.    In the industrial design world, this can be seen in the manner in which industrial designers give form during the sketching phase. An industrial designer will sketch the overall form or forms first, then concentrate on the details attached to that form or forms.

*Expert Declaration of Tim P. Fletcher*

59.    One of the primary Gestalt design principles is called "Figure-Ground" and is based on the fact that people are able to see things by distinguishing between the object (figure) and the background (ground). One can read this page because we "read" the differences in contour or outline of the different characters. The Gestalt principle of Figure-Ground contrast tells us that this perimeter, which separates the object from the background, is what distinguishes forms and shapes to consumers.

60.    There are a number of other Gestalt principles relevant to the analyses conducted in this declaration, including:

a.    ***Prägnanz (Simplicity)*:** When you are presented with a set of ambiguous or complex objects, your brain will make them appear as simple as possible.

b.    ***Continuity*:** When individual elements that are aligned with each other will appear more related than elements that are randomly placed. Implied lines can guide users and the human brain will create a path along aligned elements.

c.    ***Invariance*:** When objects are recognized independent of rotation, translation, and scale; as well as several other variations such as elastic deformations, different lighting, and inclusion or omission of certain component features.

*Expert Declaration of Tim P. Fletcher*

61.     Using these principles, I applied a series of criteria to compare the perceptual attributes of the Accused Products to those of the Asserted Trade Dress and the Asserted Design Patents.  These criteria are based on the primary Gestalt principles as I understood and taught them for many years. The continued importance and relevance of Gestalt as a means to understanding human visual perception is discussed by Stephen Palmer and other leading contemporary perception researchers. Wagemans, J., Feldman, J., Gepshtein, S., Kimchi, R., Pomerantz, J. R., van der Helm, P. A., & van Leeuwen, C. (2012), *A century of Gestalt psychology in visual perception: II. Conceptual and theoretical foundations,* Psychological Bulletin, 138(6), 1218–1252. Thus, the definitions of the perceptual attributes listed above are based on the Gestalt Principles of Perception as they apply to visual structure and overall design perception. Objects that have substantially the same perceptual attributes are known to have perceived design equivalence.

62.     I specifically selected Gestalt Perception Theory as a scientific framework for determining whether or not the design of the Accused Products is equivalent to that of the Asserted Patents.  Specifically, Gestalt principles are well-understood to be a primary scientific theory on which design education and much of modern perception science is based. Gestalt theory and related methods for

*Expert Declaration of Tim P. Fletcher*

measuring design equivalence is considered a primary research reference in the larger field of visual perception. Recent peer-reviewed articles support this view[2].

63.     I have also selected Gestalt Perception Science and related methods because Gestalt theory is widely taught at leading industrial design programs, fine art programs, and computer vision programs. In fact, I have regularly instructed students on the use of Gestalt principles in many the industrial design classes that I taught at The Hong Kong Polytechnic University. Gestalt perception science is the most widely taught general theory of shape perception as evidenced by its inclusion in many, if not all, leading academic texts. It is my understanding that much of the latest neuroscience related to visual perception verifies the basic structure and approach to Gestalt Perception Science.

**Familiarity Theory**

64.     Neuroscience has studied the effects of familiarity (a.k.a. object constancy) on how the brain recognizes objects, even if the modified, and how quickly. Gregor Rainer and Earl Miller, of the MIT, explain this through their experiments, albeit with monkeys because of the invasive nature of the experiment. Their conclusion was "Familiar objects activated fewer neurons than did novel

---

[2]Wagemans et al., "A Center of Gestalt Psychology in Visual Perception: I. Perceptual Grouping and Figure-Ground Organization," Psychology Bulletin, 138(6) (2012).

*Expert Declaration of Tim P. Fletcher*

objects, but these neurons were more narrowly tuned, and the object representation was more resistant to the effects of degradation, after experience."[3] Degradation is a sliding scale, however it can be shown that objects that have been modified, to a certain degree are still recognizable to the familiar object. In Perception: Recognizing Patterns and Objects,[4] Shiva Subramani discusses Prototype Matching as an image recognition methodology regarding familiarity. The below diagram, taken from this document, exemplifies Prototype Matching:



■ Figure 3.15: Stimuli used by Posner and Keele (1968). The top left-hand box shows the prototype; other boxes show distortions.

65.    As demonstrated in the diagram above, once the prototype, or the triangle of dots is familiar it takes several iterations of change, in this case a move from the top row to the bottom row, for the dots to no longer be recognized as a triangle.  In fact, in the above-mentioned chapter, Subramani states "When a sensory device registers a new stimulus, the device compares it with previously

---

[3] Rainer et al., Effects of Visual Experience on the Representation of Objects in the Prefrontal Cortex, Neuron, Vol 27. (2000)
[4] https://www.sagepub.com/sites/default/files/upm-binaries/53259_ch_3.pdf

*Expert Declaration of Tim P. Fletcher*

stored prototypes. An Exact match is not required; in fact, only an approximate

match is expected."


## Design Patent Infringement

66.     I understand that the test for determining infringement in design

patent cases is the "ordinary observer" test, from the decisions of the Supreme

Court in *Gorham Co. v. White* in 1871 and the Federal Circuit case in *Egyptian*

*Goddess v. Swisa* in 2008.  The ordinary observer test is whether, in the eye of an

ordinary observer, giving such attention as a purchaser usually gives, and is

familiar with the prior art, two designs are substantially the same in their overall

appearance. If the resemblance deceives the observer, inducing him or her to

purchase one supposing it to be the other, the designs are substantially the same.

The ordinary observer is presumed to have knowledge of the relevant prior art, and

proper analysis requires a side-by-side comparison of the patented design, the

accused product, and the prior art. It is also my understanding that minor

differences between a patented design and an accused product cannot prevent a

finding of infringement.

67.     The analysis requires consideration of the attention a purchaser

usually gives in the purchase of a rowing machine, and the idea that this purchaser

is familiar with the prior art.  Although neither I nor any other party has conducted

*Expert Declaration of Tim P. Fletcher*

surveys as this early stage of the case to my knowledge, I have considered the various avenues for purchase of the machines and understand a substantial number of the machines are purchased online from the parties' website (over 80%), or from third party retailers on their websites, such as Best Buy or Amazon.

68.     It stands to reason that the ordinary observer would be a typical customer purchasing a rowing machine, which would be a person who wishes to work at home and get a full workout, both aerobic and strength, with low impact. This person would have studied magazine or web-based reviews of rowing machines in preparation for purchase, or would have seen a rowing machine in a gym, store or through advertisements. I understand that this is a somewhat expensive product and the purchasing decision would of course involve consideration of the technology, features and advantages that Hydrow, iFIT and other brands have. However, in my opinion aesthetics plays a substantially important role. As I have seen from online reviews, purchasers consider the Hydrow Rower a piece of exercise equipment that you can feel comfortable having in the middle of a room, and not have to hide, and this strongly suggests that aesthetic appearance plays a role in the purchasing decision. Also, in his declaration, the Hydrow CEO states: "Existing rowing machines on the market were neither beautiful nor fun. They were ugly, noisy, and boring." In fact, based on the Hydrow CEO declaration and the fact that iFIT clearly re-designed their

*Expert Declaration of Tim P. Fletcher*

RW900 to include this this aesthetic feature I conclude that both parties acknowledge that this aesthetic feature plays a significant role in the purchasing decision. As a further indication of the importance of the aesthetic look of the Hydrow Rower, I understand that it received an iF Design Award. As an industrial designer, I know that iF is one of the few worldwide design competitions that is greatly coveted by my profession. While certain functional features are supplied in the submission for this award, these are to help explain the user experience, and a product would never win an iF award if it were not aesthetically pleasing and only had interesting functional features. The iF Award states "the product's sleek, sculptural form reinvents the traditional look of rowing machines".[5]

69.    Based on my experience and review of the parties' websites and other sales sources, and consideration of the above scientific principles, in my opinion, the typical purchaser will give most attention to the overall base structure shape when considering the distinctions between the Patented/Accused Rowers, on the one hand, versus other rowers of the prior art, on the other hand.

70.    That is, I understand that when the differences between the claimed and accused designs are viewed in light of the prior art, the attention of the hypothetical ordinary observer may be drawn to those aspects of the claimed design that differ from the prior art.

---

[5] https://ifdesign.com/en/winner-ranking/project/hydrow/272357

*Expert Declaration of Tim P. Fletcher*

71.    In my view, the major distinction over the prior art design by the patented design is the unique and highly distinctive base structure design of the Hydrow Rower, and this means that the ordinary observer would be substantially drawn to that feature, and that feature is copied by the Accused Design.

72.    In my opinion the Accused Design is substantially the same in overall appearance as the '843 Patent.  Based upon my comparison of the claim of the Patented Design, as represented in the patent drawings, to photographs of the accused design, alongside the prior art, and using my many years of experience in design, I believe an ordinary observer, given such attention as a purchaser usually gives, would find the designs substantially similar in its overall appearance, and that such an observer would be deceived into purchasing the iFIT RW900, supposing it to be the same as Hydrow's Patented Design. Though an ordinary observer would not normally be able to see the top view (Figure 6) or the bottom view (Figure 7), because a) 85% of sales are through the internet, where these views are not offered and b) because of the size, weight and bulk of the product in physical form, I have analyzed all views of both the '843 Patent and the accused iFIT RW 900 and it does not change my view that an ordinary observer, giving such attention as a purchaser usually gives, and is familiar with the prior art would find the iFIT RW 900 to be substantially the same as the claimed design in the '843 Patent.

*Expert Declaration of Tim P. Fletcher*

73.    Below is an image by image comparison of the figures in the '843

Patent and current photos of the iFIT RW900:

| US Patent D898,843 | iFIT's RW 900 | Comparison of claimed to accused design |
|---|---|---|
| <br>FIG. 1 | <br> | - Same overall base structure.<br>- Different shape of handlebar holder.<br>- Slight shape difference in end cap. |
| <br>FIG. 2 |  | - Slight shape difference in end cap. |

*Expert Declaration of Tim P. Fletcher*

| US Patent D898,843 | iFIT's RW 900 | Comparison of claimed to accused design |
|---|---|---|
| <br>FIG. 3 |  | - Both designs have a right angle connector arm to the montor from the top of the base structure, but not claimed in '843 Patent. |
| <br>FIG. 4 |  | - Same overall base structure.<br>- Both designs have a right angle connector arm to the montor from the top of the base structure, but not claimed in '843 Patent. |
| <br>FIG. 5 |  | - Same overall base structure.<br>- Both designs have a right angle connector arm to the montor from the top of the base structure, but not claimed in '843 Patent. |

*Expert Declaration of Tim P. Fletcher*

| US Patent D898,843 | iFIT's RW 900 | Comparison of claimed to accused design |
|---|---|---|
|   FIG. 6 |  | - Claimed base structure has a slight bulge from overhead view. |
|   FIG. 7 |  | - Claimed base structure has a slight bulge from overhead view. |
|   FIG. 8 |  | - Same overall base structure. - Different shape of handlebar holder. - Both designs have a right angle connector arm to the montor from the top of the base structure, but not claimed in '843 Patent. |

In my opinion, the comparison of the claimed design figures to the

accused design confirms to me that an ordinary observer, giving such attention as a

*Expert Declaration of Tim P. Fletcher*

purchaser usually gives, would find the overall design to be substantially similar

notwithstanding the minor differences I have noted above. I base this on my

understanding of the law based on the law above and Gestalt and Familiarity

theories. In general because the base structure design is so conspicuously absent

from the prior art, I believe that that feature is the most important in analyzing

whether the overall appearance is substantially the same notwithstanding these

other minor differences.

74.    As discussed above, the '843 Patent drawings use solid black lines to

show the claimed design, and broken or dotted lines to show portions of the article

of manufacture that do not form part of the claimed design, which is in accordance

with the patent office rules I quote above.   I understand that a proper analysis

comparing the claimed design to the accused product may discount the purely

functional features of the accused product that form no part of the claimed

ornamental features, and also, where appropriate, any purely ornamental features

of the accused product that correspond to parts of the claimed article of

manufacture that are shown in broken lines.   In this patent, there are product

components of the article of manufacture that fall outside of the claimed area. For

this reason I have used a visual reduction to ensure that the same overall claimed

visual appearances are being compared. Below is a table where I have taken each

view of the '843 Patent and corresponding views that I currently possess of the

*Expert Declaration of Tim P. Fletcher*

iFIT RW900, and placed a white translucent layer, using CorelDraw graphics

software, over the areas not within the claimed areas of the patent and product.

| US Patent D898,843 | iFIT's RW 900 |
|---|---|
|  FIG. 1 |  |
|  FIG. 2 |  |
|  FIG. 3 |  |

*Expert Declaration of Tim P. Fletcher*

| US Patent D898,843 | iFIT's RW 900 |
|---|---|



*Expert Declaration of Tim P. Fletcher*



| US Patent D898,843 | iFIT's RW 900 |
|---|---|

75.    The Gestalt theory provides that in this case, that to overall visual impression, based on Figure-Ground, is one of boomerang-like angular bend. This is the largest mass of the product and largest organic shape, which when compared to more geometric shapes of the other components, makes it stand out. Also, based on Continuity, the strong organically angular direction of the lines of this shape creates a bold and strongly defined boomerang-like shape that the brain would process more as unfamiliar, based on the prior art, while using less processing for

*Expert Declaration of Tim P. Fletcher*

the more familiar other components (an ordinary observer expects a monitor,

moveable seat, foot pads, handlebar and feet), as shown in this modified image

below:



*Expert Declaration of Tim P. Fletcher*

76.    Familiarity Theory also provides in this case, that an ordinary observer would confuse the '843 design with the iFIT RW 900 design because, any differences are so small that not enough iterations of change have occurred to allow the brain to process this as a different object. Below, is a rough comparison of the Continuity lines of both designs to show the small amount of change:



**Side - Hydrow Rower**

FIG. 4

*Expert Declaration of Tim P. Fletcher*

**Side - iFIT RW 900**



**Perspective - Hydrow Rower**



*Expert Declaration of Tim P. Fletcher*



77.     Reviewing the prior art cited in the file history of the patent, shown above, the patent design departs from the prior art in the overall base structure design, providing a unique overall impression that provides a new rowing product class that is aesthetically different from prior designs.

78.     In general, the prior art refences for the rowing machine article of manufacture represent either bare bone fabricated parts, such as I-beams, tubular steel or straight extruded metal forms. The S20180056117A1 Patent Application a slightly more organic form, but the form itself is substantially different from the '843 and iFIT RW 900 designs.

79.     Based on this analysis, it is my opinion that the Patented Design and Accused Design are much closer in overall impression to each other than either is

*Expert Declaration of Tim P. Fletcher*

to the prior art, and that this suggests the ordinary observer would find the Patented and Accused Designs to be substantially similar.

80.    Below I present a three-way comparison of the asserted patent, the accused product, and the relevant prior art, for purposes of demonstrating the requirements for a proper infringement analysis. True and correct copies of the below prior can be found in Exhibits 4-15.

| Side View Analysis | | |
|---|---|---|
| **'843 Patent** | **iFIT RW900** | **US D861,805** |
|  |  |  |

| **'843 Patent** | **iFIT RW900** | **KR 3005472670000** |
|---|---|---|
|  |  |  |

*Expert Declaration of Tim P. Fletcher*

| '843 Patent | iFIT RW900 | US 9,901,768 |
|---|---|---|
|  |  |  |

| '843 Patent | iFIT RW900 | US 2011/0028278 A1 |
|---|---|---|
|  |  |  |

| '843 Patent | iFIT RW900 | US 2018/0169463 A1 |
|---|---|---|
|  |  |  |

| '843 Patent | iFIT RW900 | US 2018/0056117 A1 |
|---|---|---|
|  |  |  |

*Expert Declaration of Tim P. Fletcher*

| '843 Patent | iFIT RW900 | US 2018/0272182 A1 |
|---|---|---|
|  |  |  |

| '843 Patent | iFIT RW900 | US D609,288 |
|---|---|---|
|  |  |  |

| '843 Patent | iFIT RW900 | US D632,746 |
|---|---|---|
|  |  |  |

*Expert Declaration of Tim P. Fletcher*

| '843 Patent | iFIT RW900 | US D691,678 |
|---|---|---|
|  |  |  |

| '843 Patent | iFIT RW900 | US D712,493 |
|---|---|---|
|  |  |  |

| '843 Patent | iFIT RW900 | US D741,960 |
|---|---|---|
|  |  |  |

## Perspective View Analysis

*Expert Declaration of Tim P. Fletcher*

| '843 Patent | iFIT RW900 | US D861,805 |
|---|---|---|
|  |  |  |
| '843 Patent | iFIT RW900 | KR 3005472670000 |
|  |  |  |
| '843 Patent | iFIT RW900 | US 9,901,768 |
|  |  |  |

*Expert Declaration of Tim P. Fletcher*

| '843 Patent | iFIT RW900 | US 2011/0028278 A1 |
|:---:|:---:|:---:|
|  |  |  |
| '843 Patent | iFIT RW900 | US 2018/0169463 A1 |
|  |  |  |
| '843 Patent | iFIT RW900 | US 2018/0056117 A1 |
|  |  |  |

*Expert Declaration of Tim P. Fletcher*

| '843 Patent | iFIT RW900 | US 2018/0272182 A1 |
|---|---|---|
|  |  |  |

| '843 Patent | iFIT RW900 | US D609,288 |
|---|---|---|
|  |  |  |

| '843 Patent | iFIT RW900 | US D632,746 |
|---|---|---|
|  |  |  |

*Expert Declaration of Tim P. Fletcher*

| '843 Patent | iFIT RW900 | US D691,678 |
|---|---|---|
|  |  |  |
| '843 Patent | iFIT RW900 | US D712,493 |
|  |  |  |
| '843 Patent | iFIT RW900 | US D741,960 |
|  |  |  |

*Expert Declaration of Tim P. Fletcher*

Based on my above three-way comparison of the asserted patent, the accused product, and the relevant prior art, I believe that the closest prior art reference would be the US D861,805 above, however I find it no way substantially the same as the claimed overall ornamental appearance of the '843 Patent.

**Trade Dress Infringement**

81.    I understand that for trade dress infringement, Hydrow's burden is to show: 1) the design is non-functional; (2) the design is has acquired secondary meaning; and (3) consumers are likely to confuse the source of the plaintiff's product with that of the defendant's product.

82.    Above I addressed my opinion that the Hydrow Trade Dress is non-functional.

83.    I understand that the Hydrow Trade Dress has achieved secondary meaning, as supported by the Declaration of Hydrow's CEO, and I have been asked to assume this is the case for the purposes of this Declaration. In my research, to date, I have found statements of secondary meaning, from a single Reddit web page[6]  I found such statements as "*I wonder if they're just white labeling their own hydrows lol*" and "*They've take the Hydrow styling*". Based on this kind of statement, I am sure with further research that evidence of secondary meaning will be found.

---

[6] https://www.reddit.com/r/nordictrack/comments/s7vgy0/the_new_rw900_rower_design/

*Expert Declaration of Tim P. Fletcher*

84.    I understand that a likelihood of confusion exists when consumers

viewing the defendant's trade dress probably would assume that the product it

represents is associated with the source of a different product identified by the

plaintiff's similar trade dress.  Put another way, infringement requires a finding

that an appreciable number of ordinarily prudent consumers of the type of product

in question are likely to be confused as the source of the goods.

85.    I understand that this Court applies the factors set forth in *Interpace*

*Corp. v. Lapp, Inc.*, 721 F.2d 460 (3d Cir. 1983) in determining whether there is

likelihood of confusion.

86.    The Lapp factors include:  (1) the degree of similarity between the

plaintiff's trade dress and the allegedly infringing trade dress; (2) the strength of

the plaintiff's trade dress; (3) the price of the goods and other factors indicative of

the care and attention expected of consumers when making a purchase; (4) the

length of time the defendant has used its trade dress without evidence of actual

confusion arising; (5) the intent of the defendant in adopting its trade dress; (6) the

evidence of actual confusion; (7) whether the goods, though not competing, are

marketed through the same channels of trade and advertised through the same

media; (8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers because of the

similarity of function; (10) other facts suggesting that the consuming public might

*Expert Declaration of Tim P. Fletcher*

expect the plaintiff to manufacture a product in the defendant's market, or that the plaintiff is likely to expand into that market.

87.    I understand courts permit expert testimony on these factors.

88.    I understand that not all factors will be relevant in all cases and the single most important factor in determining likelihood of confusion is trade dress similarity.

89.    **Similarity** - As discussed above in detail with respect to my comparisons of the patented and accused designs, in my opinion the Hydrow Trade Dress is substantially similar to the accused RW900.  The elements of the Hydrow Rower subject to trade dress protection, discussed above, appear to be substantially present in the iFIT RW900:

| **Hydrow Rower** | **NordicTrack RW900** |



90.    As previously stated, the Gestalt theory provides that in this case, that to overall visual impression, based on Figure-Ground, is one of boomerang-like

*Expert Declaration of Tim P. Fletcher*

angular bend. This is the largest mass of the product and organic shape, when

compared to more geometric shapes of the other components makes it stand out.

Based on Continuity, the strong organically angular direction of the lines of this

shape creates a bold and strongly defined boomerang-like shape that the brain

would process more as unfamiliar, based on the prior art, while using less

processing for the more familiar other components (an ordinary observer expects a

monitor, moveable seat, foot pads, handlebar and feet), as shown in this modified

image below:



*Expert Declaration of Tim P. Fletcher*

**Perspective - Continuity Lines (in Red)**



FIG. 1

As also previously stated, Familiarity Theory provides in this case, that an ordinary observer would confuse the '843 design with the iFIT RW 900 design because, any differences are so small that not enough iterations of change have occurred to allow the brain to process this as a different object. Below, is a rough comparison of the Continuity lines of both designs to show the small amount of change:

*Expert Declaration of Tim P. Fletcher*



*Expert Declaration of Tim P. Fletcher*



91.    **Strength** – Based on the prior art as shown above, and competitive product research I have done to date, and the extremely different overall visual appearance that Hydrow created, the Hydrow Trade Dress in this case is very strong.

*Expert Declaration of Tim P. Fletcher*

92.    **Length of time in Use** – Hydrow has existed, in one form or the other, since 2017. The Hydrow Rower entered the market in 2018. The iFIT RW 900 design was introduced into the market in February 2022. Therefore, in the approximately four years that Hydrow has been in existence, they have practiced their Trade Dress for three years or, 75% of the company's life. I believe this would be considered a long length of time in use.

93.    **Intent** – At this early stage, I cannot comment on intent at this time.

94.    **Evidence of actual confusion** – I understand that the iFIT product has only recently been launched, such that evidence of actual confusion is yet to be revealed.

95.    **Same Marketing and Sales Channels** - I understand that the Hydrow and iFIT have the same sales channels, as supported by the Declaration of Hydrow's CEO, and I have been asked to assume this is the case for the purposes of this Declaration.

96.    **Relationship based on Similarity of Function** – Being that these are both rowing machines, the functionality of the overall products are exactly the same. This in no implies that I believe the Asserted Trade Dress Rights are de jure functional, as I believe, and the prior art review so far confirms, the Asserted Trade Dress Rights are de facto and not dictated by function in any way.

*Expert Declaration of Tim P. Fletcher*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


Date:  April 4, 2022


_____

Tim P. Fletcher